IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHANIE WILLIAMS,<br>    Plaintiff, | §<br>§<br>§ | Civil Action No. 4:18-cv-3991 |
| vs. | §<br>§ | JURY TRIAL DEMANDED |
| FORT BEND COUNTY<br>WOMEN'S CENTER, INC. and<br>KATHERIN SANDERS,<br>    Defendant. | §<br>§<br>§<br>§ | |

### PLAINTIFF'S COMPLAINT

Plaintiff, STEPHANIE WILLIAMS, now files this Complaint against Defendants FORT BEND COUNTY WOMEN'S CENTER, INC. and KATHERIN SANDERS, complaining about their acts in vilation of the Americans with Disabilities Act, and Sanders' assaultive conduct. In support, Williams would show the following.

### PARTIES

1. Plaintiff STEPHANIE WILLIAMS is a citizen of the United States, and is a resident of Orchard, Texas.

2. Defendant FORT BEND COUNTY WOMEN'S CENTER, INC. ("the Women's Center") is a domestic non-profit corporation with its principal place in Fort Bend County, Texas. It may be served with process through its Registered Agent for service of process, Vita Goodell, 1002 Wilson Drive, Rosenberg, TX, 77471, or as may otherwise be provided pursuant to the Federal Rules of Civil Procedure.

3. Defendant KATHERIN SANDERS is a natural person who is believed to reside in Houston, Harris County, Texas. She may be served with process at her place of employment, 1002 Wilson Drive, Rosenberg, TX, 77471, or wherever else she may be found.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiff's claims against Fort Bend County Women's Center arises under the laws of the United States of America. The Court also has supplemental jurisdiction over the claim against Katherin Sanders pursuant to 28 U.S.C. § 1367(a) because it forms part of the same case or controversy asserted against the Women's Center.

5. Venue is proper in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1391(b), as all or part of the claims alleged in this Complaint are based upon conduct committed by the Defendants within this judicial district.

## FACTS

6. Williams is a former employee of Defendant, the Fort Bend County Women's Center ("FBWC" or "the Women's Center").

7. According to the Women's Center's website, it operates a dedicated domestic violence and sexual assault emergency shelter and crisis hotline in Fort Bend County, Texas.

8. Plaintiff was initially hired in early 2015 as a Residential Advocate working at FBWC's shelter. Plaintiff was subsequently promoted to the position of Lead Residential Advocate.

9. In May 2016, Plaintiff contracted mononucleosis, a viral illness that can cause (among other things) extreme fatigue lasting over an extended period of time.

10. Williams' extended illness caught the attention of Defendant Katherin Sanders, Director of the Women's Center's shelter.

11. On or around July 1, 2016, Sanders called Williams into her office and asked her why she was so sick all the time. Williams explained that she had had mono, and she understood

that the virus weakened her immune system. Sanders responded that Williams should quit her job and go on disability. Williams said she did not think she qualified for disability; yes, she did get sick, but not so sick that she could no longer work.

12. Sanders responded that Williams should still go out on disability. Why? She asserted that if she kept getting sick it could affect Williams' chances of having a baby.

13. This remark made Williams extremely uncomfortable, which she told Sanders. Unwilling to take the hint, Sanders pressed on, asking *why* her remark made Williams uncomfortable. Williams explained that she suffered from infertility. Infertility constitutes a disability as that term is defined by the Americans with Disabilities Act.

14. Sanders still wouldn't drop the topic. She proceeded to ask Plaintiff why she was infertile, whether she had attempted artificial insemination, and other invasive questions about her reproductive health. Williams again said she did not feel comfortable talking about these matters, and she didn't want children in any event.

15. A few days later, Williams pulled HR Director Lucy Smith aside. She told Smith what had happened, that Sanders' questions made her very uncomfortable, and that she didn't want to talk about the subject.

16. The retaliation against Plaintiff began not long after that conversation with Smith.

17. Sanders and Director of Operations Abeer Monem began finding reasons to nit-pick Plaintiff's work performance. In early August, shortly after the initial complaint to HR, Sanders accused Williams of having used too much paid time off, even though she had not. Sanders warned Williams about having additional illness-related absences, telling her she had to 'suck it up' or she would be fired. Then, less than two weeks later, Sanders told Williams during a meeting that she was being put on probation.

18. But Sanders had no authority to put Williams on probation, a decision that could only be made by the Defendant's Executive Director. The Executive Director, though, had no knowledge of Sanders' attempt to discipline Williams.

19. Plaintiff complained again to Human Resources about Sanders' attempt to put her on probation. Sometime in October 2016, the Women's Center reversed Sanders' decision to put Plaintiff on probation.

20. Williams has long suffered from major depressive disorder. When she was younger, she engaged in cutting. Because of that history of cutting, Williams has numerous visible scars on her arms. She therefore usually wears long sleeves so that her scars cannot be seen.

21. In November 2016, on two separate occasions, Sanders engaged in completely bizarre and illegal behavior relating to Williams' history of cutting. Sanders apparently noticed the scars when Plaintiff's arm was outstretched and her shirt did not cover her entire arm. On November 25, she saw the scars and asked if the scars were self-inflicted. She then took Williams' arms in her hands, began pointing to and tracing the scars on her arms, and asking about each one. This conduct, especially including the physical touching of Williams, was extremely invasive and bizarre.

22. Williams told Sanders that she did not feel comfortable discussing this. She also did not like being touched, especially not for the purpose of her supervisor physically tracing over the physical scars of her psychological problems.

23. Sanders did not take the hint and on November 29 once again brought up the topic of Williams' mental health history. This time she asked whether Williams was a cutter; how long she was a cutter; why she cut herself; when the last time was that Williams cut herself; whether Williams suffered from depression; and whether Williams had ever attempted suicide. Williams

4

did not answer these questions and told Sanders repeatedly that she did not feel comfortable talking about it. Sanders kept asking anyway.

24. Williams left Sanders' office and promptly reported Sanders' bizarre conduct to Human Resources. In an email to Lucy Smith of Human Resources that she sent around 7:55 p.m. that night, Williams said that she wanted "to file a complaint regarding the comments [Sanders has] been making about my scars and mental health. I do not feel that this is appropriate for a manager to ask about these things."

25. Sanders subsequently admitted to Lucy Smith that she had, indeed, asked Williams about her scars.

26. The Women's Center admitted later to the EEOC that Sanders had asked Williams questions about her scars.

27. Needless to say, Williams' report to HR about Sanders' inappropriate questions further inflamed Sanders' efforts at retaliation. A few weeks after Williams' meritorious complaint to HR, Sanders once again threatened Williams' job. In a December 20, 2016, meeting, Sanders recited a list of supposed shortcomings before telling Williams that she was now on something called "job-in-jeopardy status", which was a FBWC euphemism for probation.

28. Williams submitted a memo to HR the same day, rebutting each of supposed bases for Sanders' latest job action against her. She concluded her memo by complaining that this was all just "a retaliatory effort due to my repeated reports of her ethical violations to HR. I feel that she will not stop harassing me, because even if I do the right thing and report the harassment, it seems to get me in more trouble and her behavior towards me gets worse."

29. On or about January 13, 2017, Williams filed a charge of discrimination with the United States Equal Employment Opportunity Commission. In her charge, Plaintiff complained

about Sanders' inappropriate inquiries about her reproductive life and her mental health situation. She informed Smith about the charge by email on January 18, 2017.

30. On February 27, 2017, less than six weeks after learning of Williams' EEOC charge, Defendant terminated her employment.

31. Plaintiff amended her charge on March 16, 2017, alleging that she was terminated for filing her EEOC charge.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

32. Plaintiff timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission.

33. Plaintiff timely filed an amended charge of discrimination with the United States Equal Employment Opportunity Commission.

34. The EEOC issued a Dismissal and Notice of Suit Rights that was dated July 31, 2018.

35. This lawsuit has been filed within 90 days of issuance of that Notice.

36. This lawsuit has therefore been filed within 90 days of receipt of that Notice.

## FIRST CAUSE OF ACTION
## (DISABILITY DISCRIMINATION BY THE WOMEN'S CENTER)

37. Plaintiff incorporates each of the foregoing allegations as if fully stated herein.

38. Plaintiff was an employee of the Women's Center, as that term is defined by the Americans with Disabilities Act.

39. Plaintiff has one or more disabilities, as that term is defined by the Americans with Disabilities Act. Specifically, she suffers from infertility, major depressive disorders, and anxiety. She also has a record of having had a disability, particularly with respect to her depression and anxiety and the physical scars that these conditions have left on her body. She also appears to have

6

been regarded as being disabled, inasmuch as Sanders tried to convince Plaintiff to quit and go on disability, even though Plaintiff assured Sanders that she had not been so ill that she was incapable of performing her job.

40. At all times during Plaintiff's employment, the Women's Center had at least fifteen employees.

41. When Sanders asked Plaintiff about why she did not quit her job and go out on disability, particularly her questions about the nature and extent of Plaintiff's infertility, the Defendant violated the ADA's prohibition against making inquiries of an employee as to *whether* such employee is an individual with a disability *or* as to the nature or severity of the disability. 42 U.S.C. § 12112(d)(1) and (4).

42. The Women's Center likewise violated the ADA's prohibition against making medical inquiries when Sanders on two occasions in November 2016 peppered Plaintiff with questions about the nature and extent of her mental health struggles.

43. Sanders' questions about Plaintiff's fertility were not related to Plaintiff's job.

44. Sanders' questions about Plaintiff's history of cutting and her mental health history were not related to Plaintiff's job.

45. The Women's Center never asserted to the EEOC that Sanders' questions about Plaintiff's fertility, history of cutting, or her mental health history were related to Plaintiff's job.

46. There was no business necessity for Sanders to ask Plaintiff questions about her fertility.

47. There was no business necessity for Sanders to ask Plaintiff questions about the scars on her arms, her history of cutting, or her mental health history.

48. The Women's Center never asserted to the EEOC that there was any business necessity for Sanders' questions about Plaintiff's fertility, scars, history of cutting, or mental health history.

49. The conduct described above constitutes a violation of the Americans with Disabilities Act.

50. Plaintiff has been damaged as a result of this discrimination.

51. The conduct described above was done with malice or with reckless disregard for Plaintiff's federally-protected rights. An award of exemplary damages is therefore warranted.

## SECOND CAUSE OF ACTION
### (PROHIBITED RETALIATION BY THE WOMEN'S CENTER)

52. Plaintiff incorporates each of the foregoing allegations as if fully stated herein.

53. Plaintiff engaged in conduct protected by the ADA when she complained to HR in July 2016 about Sanders' fertility-related questions.

54. Plaintiff engaged in conduct protected by the ADA when she complained to HR on November 29, 2016, about Sanders' questions and conduct about her scars and mental health history.

55. Plaintiff engaged in conduct protected by the ADA when she complained to HR in December 2016 that she was being put on job-in-jeopardy status because of her earlier complaints to HR about Sanders' inappropriate conduct.

56. Plaintiff engaged in conduct protected by the ADA when she filed an EEOC charge.

57. Plaintiff engaged in conduct protected by the ADA when she informed Smith that she had filed an EEOC charge.

58. Plaintiff was terminated by the Women's Center approximately 5-6 weeks after it learned of her EEOC charge.

59. Plaintiff was terminated by the Women's Center in retaliation for her protected acts as detailed above.

60. Such conduct constitutes retaliation in violation of 42 U.S.C. § 12203.

61. Plaintiff was damaged as a result of the Women's Center's retaliation against her.

62. The Women's Center's retaliation against Plaintiff was done with malice or reckless disregard for Plaintiff's federally-protected rights. An award of exemplary damages is therefore warranted.

### THIRD CAUSE OF ACTION
### (ASSAULT -- SANDERS)

63. Plaintiff incorporates each of the foregoing allegations as if fully stated herein.

64. On or about November 25, 2016, Sanders intentionally or knowingly caused physical contact with Plaintiff under circumstances when she knew or reasonably should have known that Plaintiff would have regarded the contact as offensive or provocative.

65. Plaintiff was damaged by Sanders' offensive touching of her.

66. Sanders knew at the time she offensively touched Plaintiff about the types of psychological and psychiatric conditions that cause young women to have engaged in self-harm. From an objective standpoint, Sanders knew that calling attention to Plaintiff's mental health history and acts of self-harm, and especially physically touching the Plaintiff and tracing Plaintiff's scars with her fingers, involved a high degree of risk of causing harm to the Plaintiff. Sanders knew not just about these risks, but about Plaintiff's right to be free from inappropriate medical inquiries by her supervisor. Yet, Sanders touched Plaintiff anyway. An award of punitive damages is therefore warranted.

## ATTORNEYS' FEES

67. As the prevailing party, Plaintiff seeks an award of reasonable and necessary attorney's fees with respect to her claims arising under the ADA.

## JURY DEMAND

68. Plaintiff demands a jury trial on all claims asserted herein.

## PRAYER

WHEREFORE, Plaintiff Stephanie Williams hereby prays that Defendants be required to answer this suit and that, upon trial of this case, the Court award her:

a) Back pay;
b) Compensatory damages;
c) Punitive damages;
d) Reinstatement and/or front pay;
e) Reasonable and necessary attorney's fees;
f) Taxable court costs, including expert fees; and
g) Such other and further relief to which she may show herself entitled.

Respectfully submitted,

DOW GOLUB REMELS & GILBREATH, PLLC

/s/ Andrew S. Golub
Andrew S. Golub
Texas Bar No. 08114950
asgolub@dowgolub.com
2700 Post Oak Blvd., Suite 1750
Houston, Texas 77056
Telephone: (713) 526-3700
Facsimile: (713) 526-3750

ATTORNEYS FOR PLAINTIFF
STEPHANIE WILLIAMS